FIREMAN'S FUND INSURANCE CO. ET AL., APPELLANTS, v. COLUMBUS STEEL STRUCTORS CO., INC., APPELLEE.[*]

---

[*]Judgment affirmed, 168 Ohio St., 149.

198

(No. 5534—Decided August 23, 1957.)

Messrs. *Barkan, Brown, Reeves & Crites,* for appellants.
Messrs. *Wright, Harlor, Purpus, Morris & Arnold,* and Mr.
*Rudolph Janata, Jr.,* for appellee.

BRYANT, J.  This is an appeal on questions of law from the decision of the Common Pleas Court overruling the motion for a new trial of plaintiffs-appellants hereinafter called plaintiffs. Plaintiffs began this proceeding by filing a petition in the court below seeking damages in the amount of $56,101.66.  There are eight parties plaintiff.  Two of them, a corporation, Ray Lewis & Son, Inc., and a partnership, R. H. Lewis and Harold Lewis, d. b. a. Ray Lewis & Son, are the owners and operators of a machine shop located in Marysville, Ohio.  They will hereinafter be referred to as the Lewises.  The other six plaintiffs are corporations engaged in writing fire insurance.

The defendant-appellee, Columbus Steel Structors Company, Inc., hereinafter referred to as the defendant, pursuant to a contract, erected a building in Marysville for the Lewises. The building caught fire on July 17, 1952, with the result that it was almost totally destroyed and great damage was done to the contents.  The building and contents were owned by the Lewises, and the six insurance companies above referred to, on August 14, 1952, settled the claim of the Lewises by paying $48,924.71 and taking the necessary steps to subrogate the said insurance

companies to whatever rights the Lewises might have to sue as a result of the fire.

It appears that negotiations for the construction of the new building were carried on by William N. Brock as president of the defendant corporation and R. H. Lewis, Sr., and R. H. Lewis, Jr., also known as Harold Lewis, of the partnership above referred to and officers and owners of the Lewis Corporation also referred to above.

It was the claim of the Lewises in their petition that one of the reasons for obtaining a new location for and erecting a new building for what was then known as the Lewis Machine Shop was to permit them to expand their operations by entering upon die-casting operations in addition to the machine-shop operations previously carried on. Plaintiffs contend that defendant was negligent in the construction of the new building, which was a quonset type of building and in which insulation known as Ultralite "75" was installed, in that (1) the insulation material was installed in an improper manner and (2) defendant represented that such insulating material was fire resistant and suitable for shop hazards said to be common in a die-casting equipment shop, whereas, according to plaintiffs, such material was highly inflammable, not satisfactory and during normal operations created a fire hazard. It was plaintiff's contention that defendant knew of the alleged hazardous nature of insulating material but that this fact was unknown to plaintiffs. Plaintiffs claim further that they had informed defendant of the new and more hazardous type of business they were about to engage in. Defendant in its answer admitted the existence and capacity of plaintiff the Lewis Corporation, that a fire occurred, and other formal matters, and concluded with a general denial. Prior to the filing of the answer certain objections were sustained and an amended petition was filed.

The matter came on for trial before a jury in the court below and, at the conclusion of plaintiffs' evidence, defendant's motion to withdraw from the jury consideration of allegations of defective installation was concurred in by counsel for plaintiffs and sustained by the court. Plaintiffs also withdrew from consideration by the jury the amounts claimed for damages to certain open stock and damages claimed because of loss of time

and cost of cleaning up the debris. At the conclusion of all the evidence, the court overruled defendant's motion for a directed verdict. The court also overruled defendant's motion to withdraw from the jury "all pleadings and testimony in regard to representations allegedly made by the defendant to one or more of the plaintiffs." The matter was submitted to the jury under the charge of the court, excepted to in part by plaintiffs and generally by defendant, after which eleven members of the jury returned a verdict in favor of the defendant.

The objection by plaintiffs to the court's charge is as follows:

"Mr. Reeves: Will you show an objection to the charge on behalf of the plaintiff on the ground that you cannot charge the plaintiff in the same cause of action in a negligence action with contributory negligence and the assumption of risk."

On behalf of the defendant the record shows the following objection to the charge:

"Mr. Janata: Let the record show an exception by the defendant generally to the charge of the court."

The motion of plaintiffs seeking a new trial alleged that the trial court committed error of law "in its charge on negligence, contributory negligence and assumption of risk, to which exception was taken by plaintiff at the time." Following the overruling of the motion for a new trial, plaintiffs filed notice of appeal from the judgment of the trial court overruling plaintiffs' motion for a new trial. In the assignment of errors and brief the following errors were assigned:

"1. The court erred in excluding certain testimony and excluding from the consideration of the jury all references and testimony pertaining to die casting operations.

"2. The court erred in failing to overrule the motion of the defendant-appellee (hereinafter referred to as the 'defendant') at the close of plaintiffs' case and withdrawing all references to die casting equipment shop, as it applies to the issues in the case.

"3. For errors in the court's general charge."

In support of the first two assignments of error and part of the third assignment of error, plaintiffs refer to the claim in the petition and the evidence in support thereof by some of

plaintiffs' witnesses that defendant represented that the insulating material used was fire resistant and suitable for meeting the hazards commonly found in die-casting equipment shops.

The amended petition contains the following allegation:

"Plaintiffs further say that during October, 1951, the corporation of Ray Lewis & Son, Inc., entered into a written contract with defendant for the erection of a building of what is commonly classified as a quonset hut steel building, in order to carry on the manufacture of cast die products by the Ray Lewis & Son, Inc., and Ray Lewis & Son partnership. Further that at said time and place, the defendant represented to the plaintiffs Ray H. Lewis, Inc., that said quonset steel building was fire resistant and that they also agreed to insulate said building and original structure with a glass fibre insulation called Ultralite 75, which insulation, they represented to the plaintiff Ray Lewis & Son, Inc., to be fire resistant and suitable for the possibility of shop hazards such as would be common in die cast equipment shop. Further that based upon the representations made by the defendant, plaintiff Ray Lewis & Son, Inc., entered into and agreed to allow the defendant to erect said quonset type steel building and to also insulate same and the original building with Ultralite 75 glass fibre insulation. * * * Further that unknown to plaintiff Ray Lewis & Son Incorporated and Ray Lewis and Son, but well known to the defendant, the material furnished contained an asphalt and tar paper backing, which was highly inflammable and not satisfactory for use in a die cast machine shop, due to the heat arising out of normal operation and also due to the fact that defendant failed to leave the necessary air space behind said insulation, defendant created a fire hazard, known to the defendant and unknown to plaintiffs Ray Lewis & Son, Inc., and Ray Lewis & Son.''

The president of defendant corporation, William N. Brock, having been called for cross-examination by plaintiffs testified that he visited the Lewis machine shop at the old location, observing lathes, a milling machine and one screw machine; that he is well acquainted with them but is not acquainted with all the machines and tools used in the die-casting business; that he worked five years in a machine shop; and that the elder Lewis informed him that the business was being expanded. With

reference to information received by Brock as to die-casting operations the following appears in the record:

"Q. Did he tell you about what he meant by the word, 'expanding,' sir? A. Well, I don't know as he specified anything specific, other than expanding.

"Q. Did he tell you that they were going to start doing some die-casting operations, sir? A. That is very possible. It has been five years ago since I talked to him. I couldn't say exactly."

Further, Brock testified as follows:

"Q. But you knew that there were to be two concrete bases there for two die casting machines? A. I couldn't say two, three, or how many. I do know there was to be extra heavy concrete at certain points.

"Q. Mr. Brock, you know that a die casting machine has an open metal pot in it, do you not, sir? A. I do now, sir.

"Q. That the temperature of that open metal pot is 750 degrees? A. No, I didn't know how hot it would be.

"Q. Well, you know that it is molten metal in the pot, do you not, sir? A. Yes, I have found that out since the fire."

From plaintiffs' exhibit W-1 and on the reverse side thereof there is a paragraph devoted to the fire resistant qualities of the insulation under consideration. It is undisputed that this printed material was handed to the Lewises in connection with the negotiations leading to the contract to build the building. The second paragraph of the exhibit above referred to is entitled, "Fire resistance," and contains this statement:

"Because it's made of glass fibers, Ultralite '75' insulation is noncombustible, noninflammable and chemically inert. This eliminates possibility of shop hazards to materials, equipment and workmen when heat or open flame is used near the insulation."

Enough has been quoted to illustrate the theory upon which the plaintiffs tried their case and the basis on which they made their claim of negligence and damages. Exhibit X indicates that some of the equipment which might appear to have a connection with the die-casting business was damaged by the fire. For example, on page 33 of exhibit X reference is made to a B & T diecasting machine which cost $21,000 and which was

claimed to be damaged to the extent of $4,000. Reference is also made, on page 31 thereof, to losses claimed in the amount of $51 for certain knock-out pins for diecasting dies. Other items which appear to have some connection with die casting and which appear to have been damaged in the fire include die chasers at page 25; plunger for die-casting machine at page 23; certain die wrenches and rigid pipe dies at page 16; and at page 9 die inserts of the claimed value of $1,368.

The testimony indicated that die-casting operations had not been started at the time the fire occurred. However, the fact that one or more sizable die-casting machines actually were in place inside the building, together with the other items herein referred to, lends credence to the claim of the plaintiffs that they intended to expand their operation where the potential heat could be considerably greater than in the operations previously carried on.

The claim of the Lewises was clear and unmistakable. They contended defendant knew of the increased fire hazards and agreed to build so as to protect against them and they wanted the jury to bear that in mind—that defendant knew the new plant would be a die-casting as well as a machine shop operation and that the subject of insulation was discussed in the light of those new requirements. On direct examination Lewis, Sr., told of their original plan to use what was variously referred to as sheet rock or an asbestos board. He told of a conversation with Brock, president of defendant corporation, who said that they could furnish a cheaper insulation and just as good at a lot smaller cost. We quote from the direct testimony of Lewis, Sr.:

"Q. Would you tell us what you were going to do, sir? A. Well, we planned—we went out and looked at two different quonset buildings in Marysville similar to the one we had put up and we intended to insulate it the same as they did, with a— oh, it is—I call it a sheet rock. It is an asbestos board, made by Johns Manville. That is what we intended to do and Mr. Brock suggested or he asked me what kind of material we were going to use and I told him and he said, 'We can furnish you a lot cheaper insulation and just as good and at a lot less cost.' So, we talked it over there a little bit. That was in the back yard, if

I remember, at home there, and so I asked him if it was fire resistant. He said it was, and he got a circular out of his brief case and showed me where it specifically said it was especially adapted to machine shops and welding shops—fire resistant. Well, I was interested in saving money, so we took the insulation that he had."

This witness also testified that one die-casting machine was in the new building which had not been in the old building but that it had not been in operation prior to the fire. We quote from the record as follows:

"Q. I will ask you Mr. Lewis, if there was any additional equipment that was placed in the Delaware Road address before the fire that was not in the original machine shop that was in the rear of your house? A. There was one die cast machine.

"Q. Now, I will ask you, Mr. Lewis, if that die cast machine was ever in operation prior to the fire? A. No, it was not."

Based upon the statement that die-casting operations had not been begun and not withstanding the testimony that such operations were the subject of preliminary negotiations and that equipment suitable for this had actually been installed, the trial court made the following ruling with reference to testimony appearing in the record and we quote from the direct testimony of Lewis, Jr.:

"Q. Do you recall if you told him what you wanted to do with the building? After you built it? A. Yes. At that time we definitely knew what we was building the building for.

"Q. What were you building the building for, Harold? A. For a zinc die casting operation.

"Mr. Janata: I will object, Your Honor, and move it be stricken in view of the lack of causal relationship between the operation, and the fire that that reference should not be considered here.

"The Court: The objection is sustained for the reasons stated. The jury is ordered to disregard that testimony. Go ahead."

We quote from the court's charge, as follows:

"The second claim of negligence made in the petition is the

allegation that defendant represented to Lewis Corporation that the insulation, Ultralite 75, which admittedly defendant agreed to and did install in the building in question, was fire-resistant and suitable for the possibility of shop operations, rather of shop hazards, such as would be common in a die cast equipment shop, but that well known to the defendant, the material furnished contained asphalt and tarpaper backing, which was highly inflammable and not satisfactory for use in a die casting equipment shop, due to the heat arising out of normal operations, and the defendant thereby created a fire hazard known to the defendant, but unknown to the Lewis Corporation and to the Lewis partnership.

"Since the evidence is undisputed as to the fact that from the time of the completion of the building up to and including the time of the fire, that the building was not being used for die cast operations, but instead was being used solely for machine shop operations, you will disregard all references made in this claim of negligence to die cast equipment or die cast operations."

In that ruling we believe the court committed error prejudicial to the plaintiffs in sustaining defendant's motion and in the charge which excludes said evidence from the consideration of the jury. The question we are discussing is one for the jury but we believe the plaintiffs had the right to have all relevant evidence submitted to the jury for its determination. We well realize that the defendant vigorously challenged many of the statements made by the plaintiffs. The fact still remains that it was the plaintiffs' allegation in their petition that they had discussed with Brock on behalf of the defendant the fact that they wanted the new building to be fire resistant to such a degree that it would be suitable for the operation of die-casting machines with molten metal pots and the heating units which produced a great amount of heat. It was a proper question to submit to the jury and one which along with the allegations and evidence of the defendant should be considered by the jury in arriving at a verdict.

With regard to the other errors assigned by the plaintiffs we feel that they are not well taken and should be overruled.

For the reasons above set forth, error prejudicial to the

plaintiffs has been committed, and the judgment of the court below, therefore, is reversed and the matter returned for a new trial.

*Judgment reversed.*

PETREE, P. J., and MILLER, J., concur.

(Decided September 19, 1957.)

*Per Curiam.* The application for oral argument upon the application for rehearing will be denied. The application for rehearing will be denied.

PETREE, P. J., BRYANT and MILLER, JJ., concur.